IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: <br> ALLIED SYSTEM HOLDINGS INC, *et al.*, <br><br> Debtors. | Chapter 11 <br> Bank. No. 12-11564 (CSS) <br> (Jointly Administered) |
| YUCAIPA AMERICAN ALLIANCE FUND II, LP, *et al.*, <br><br> Appellants, <br><br> v. <br><br> BDCM OPPORTUNITY FUND II, LP, *et al.*, <br><br> Appellees. | Adv. Nos. 12-50947 (CSS) <br> 13-50530 (CSS) <br><br><br> Civ. Nos. 13-cv-1580 (SLR) <br> 13-cv-1583 (SLR) |

Michael R. Nestor, Esquire, Edmon L. Morton, Esquire, and Michael S. Neiburg, Esquire, of Young Conaway Stargatt & Taylor LLP, Wilmington, Delaware; Maurice M. Suh, Esquire, of Gibson, Dunn & Crutcher, LLP, Los Angeles, California. Counsel for Yucaipa American Alliance Fund I, L.P., Yucaipa American Alliance (Parallel) Fund I, L.P., Yucaipa American Alliance Fund II, L.P., and Yucaipa American Alliance (Parallel) Fund II, L.P.

Adam G. Landis, Esquire and Kerri K. Mumford, Esquire, of Landis Rath & Cobb, L.L.P., Wilmington, Delaware; Robert J. Ward, Esquire, of Schulte Roth & Zabel L.L.P., New York, New York. Counsel for BDCM Opportunity Fund II, LP, Black Diamond CLO 2005-1 Ltd., and Spectrum Investment Partners, L.P.

## MEMORANDUM OPINION

Dated: March 31 , 2016
Wilmington, Delaware

ROBINSON, District Judge

## I. INTRODUCTION

Appellants Yucaipa American Alliance Fund I, L.P., Yucaipa American Alliance

(Parallel) Fund I, L.P., Yucaipa American Alliance Fund II, L.P., and Yucaipa American

Alliance (Parallel) Fund II, L.P. (together, "Yucaipa") filed these bankruptcy appeals on

August 21, 2013. (D.I. 1)[1] The appeal arises from an order entered by the bankruptcy court

on August 7, 2013, granting a motion for summary judgment filed by BDCM Opportunity

Fund II, LP, Black Diamond CLO 2005-1 Ltd, and Spectrum Investment Partners, L.P.

(together, "BD/S") in two adversary proceedings,[2] which determined that BD/S were

"Requisite Lenders" as that term is defined in a certain first lien credit agreement ("FLCA").[3]

In reaching its conclusion, the bankruptcy court determined that: (i) Yucaipa was collaterally

estopped from arguing that a purported fourth amendment to the FLCA ("Fourth

Amendment")[4] was valid, based upon a prior ruling by a New York state court that the

Fourth Amendment was "invalid and of no force or effect";[5] (ii) a previous amendment to the

FLCA ("Third Amendment")[6] was validly enacted and governed the Requisite Lender

---

[1] The court will cite Appellants' Opening Brief as (Yucaipa at __); Appellees' Opposition Brief as (BD/S at __); and Appellants' Reply Brief as (Yucaipa R. at __). Other "D.I." references will be to the docket for Civ. No. 13-1580 (SLR).

[2] *Allied Systems Holdings, Inc. v. Am. Money Mgmt. Corp., et al.*, Adv. Proc. No. 12-50947 (CSS) (Bankr. D. Del.) (the "Allied Action"); *The Official Committee of Unsecured Creditors of Allied Systems Holdings, Inc. v. Yucaipa Am. Alliance Fund I, L.P. et al.*, Adv. Proc. No. 13-50530 (CSS) (Bankr. D. Del.) (the "Committee Action").

[3] "FLCA" refers to Amended and Restated First Lien Secured Super-Priority Debtor in Possession and Exit Credit and Guaranty Agreement, dated May 30, 2007. (Committee Action, D.I. 255, Ex. 8)

[4] "Fourth Amendment" refers to Amendment No. 4 to FLCA, dated August 19, 2009. (Committee Action D.I. 255, Ex. 18)

[5] *See BDCM Opportunity Fund II, LP v. Yucaipa Am. Alliance Fund I, LP,* No. 650150/2012, 2013 N.Y. Misc. LEXIS 1993, *13 (N.Y. Sup. Ct. Mar. 8, 2013).

[6] "Third Amendment" refers to Amendment No. 3 to FLCA, dated as of April 17, 2008. (Committee Action D.I. 255, Ex. 2)

determination; and (iii) Yucaipa's improperly acquired First Lien Debt had no voting rights and must be excluded from the Requisite Lender calculation. [7] (*See* Committee Action D.I. 280, Allied Action D.I. 275 (bankruptcy court order granting summary judgment); 7/30/13 Hr'g. Tr. at 120-30 (bankruptcy court bench ruling))

## II. BACKGROUND

### A. The FLCA

This appeal arises from the bankruptcy cases of Allied Systems Holdings, Inc., together with its subsidiaries ("Allied").[8] Allied was a provider of distribution and transportation services to the automotive industry. Allied emerged from its first bankruptcy in May 2007, and Yucaipa became Allied's majority shareholder under the plan of reorganization, with control over its board of directors. To finance its emergence from bankruptcy, Allied borrowed $265 million of first lien debt (the "First Lien Debt") from numerous lenders ("Lenders") pursuant to the FLCA. The First Lien Debt was comprised of: (i) term loans of $180 million (the "Term Loans"); (ii) a revolving credit facility of $35 million (the "Revolving Loans"); and (iii) a synthetic letter of credit facility of $50 million (the "LC Commitments"). At the time of the motion for summary judgment, the obligations outstanding under the FLCA consisted of $175,950,000 of Term Loans, $33,097,530 of LC Commitments, and approximately $35,000,000 of Revolving Exposure for a total of $244,047,530 of First Lien Debt. (*See* MSJ at 28)[9]

---

[7] The court will cite to the docket of the underlying chapter 11 cases, *In re Allied Systems Holdings, Inc., et al.*, No. 12-11564 (CSS) as (Bankr. D.I. __). The court will cite the transcript of the bankruptcy court's July 30, 2013 bench ruling, Bankr. D.I. 1519, as (7/30/13 Hr'g. Tr. at __).

[8] Allied Systems Holdings, Inc. is now known as ASHINC Corporation.

[9] The court will cite BD/S's memorandum of law in support of the MSJ (Committee Action D.I. 254) as (MSJ at __); Yucaipa's opposition to the MSJ (Committee Action D.I. 261) as (MSJ Opp. at __); and BD/S's reply in further support of the MSJ (Committee Action D.I. 267) as (MSJ Reply at __).

As defined in the FLCA, one or more Lenders holding more than 50% of the total

First Lien Debt can act as the "Requisite Lenders." Specifically, the FLCA defined

"Requisite Lenders" as

> one or more Lenders having or holding Term Loan Exposure, LC
> Exposure and/or Revolving Exposure and representing more than 50%
> of the sum of (i) the aggregate Term Loan Exposure of all Lenders, (ii)
> the aggregate LC Exposure of all Lenders and (iii) the aggregate
> Revolving Exposure of all Lenders.

(FLCA § 1.1) Under the FLCA, the Requisite Lenders are vested with authority to exercise

– or refrain from exercising – certain rights and remedies on behalf of all Lenders, such as

declaring events of default, demanding immediate payment by Allied of any and all amounts

due, or commencing foreclosure. (Id. §§ 8.1, 9.8)

Under the FLCA, the only parties eligible to act as Requisite Lenders were

"Lenders," which consisted only of the original Lender signatories to the FLCA and "Eligible

Assignees" that subsequently become Lenders pursuant to an Assignment Agreement. (Id.

§ 1.1) Yucaipa was not an original Lender signatory to the FLCA, and the definition of

Eligible Assignee provided that "no . . . Sponsor shall be an Eligible Assignee." (Id.)

"Sponsor" is a defined term applicable only to Yucaipa. (See id. ("Sponsor means,

collectively, Yucaipa American Alliance Fund I, LP and Yucaipa American Alliance (Parallel)

Fund I, LP")) BD/S asserts that this prohibition recognized the manifest conflict of interest

between Yucaipa (as Allied's controlling shareholder) and the Lenders (as creditors of

Allied).

Section 10.5(b) of the FLCA expressly prohibits, absent the consent of all affected

Lenders, any amendment of the FLCA "if the effect thereof would . . . amend the definition

of Requisite Lenders." (Id. § 10.5(b)(ix)) In addition to the amendment of the Requisite

Lenders definition, § 10.5(b) lists other amendments that require the written consent of

3

"each Lender … that would be affected thereby" in order to be effective. (Id. § 10.5(b)(i) - (x))

On April 17, 2008, Yucaipa and Allied requested and obtained consent from a majority of the Lenders to amend the FLCA and enter into the Third Amendment,[10] to permit Yucaipa to become a "Restricted Sponsor Affiliate" and purchase Term Loans under limited circumstances and conditions with certain restrictions. Pursuant to the Third Amendment, Yucaipa was: permitted to acquire Term Loans only and prohibited from acquiring any Revolving Loans or LC Commitments (see Third Amendment, § 2.1(c)); prohibited from acquiring Term Loans exceeding the lesser of (i) 25% of the outstanding Term Loan Exposure or (ii) $50 million in principal amount of Term Loans (id. §§ 2.7(c), 2.7(e)); required to make a capital contribution to Allied of no less than 50% of the aggregate principal amount of any Term Loans that Yucaipa obtained within 10 days of the date of acquisition (id. § 2.7(e)); prohibited from exercising any and all voting rights it would otherwise have as a Lender "for all purposes" (id. §§ 2.1(e), 2.7(a), 2.7(b), 2.7(e)); and subject to a broadly worded covenant not to sue (id. § 2.7). Further, the Third Amendment prohibited Yucaipa from including its Term Loans in any calculation of Term Loan Exposure when such calculation was required under the FLCA with respect to any provision relating to the voting rights of Lenders. (See id. § 2.1(e)) Thus, while the Third Amendment allowed Yucaipa to acquire a limited amount of Term Loans from the other Lenders, it imposed onerous restrictions on Yucaipa. Yucaipa did not purchase any Term Loans following the execution of the Third Amendment and purchased only second lien debt. (See Yucaipa R. at 3)

---

[10] The first two amendments to the FLCA are not relevant to this dispute.

4

In February 2009, ComVest Investment Partners III, L.P. ("ComVest") acquired approximately 55% of the First Lien Debt and became Requisite Lender. (*See* Yucaipa at 8) On August 21, 2009, after Allied had been in default under its FLCA for more than a year, Allied entered into the Fourth Amendment with ComVest. The Fourth Amendment lifted all restrictions on Yucaipa's acquisition of the First Lien Debt and allowed Yucaipa, for the first time, to acquire any type of First Lien Debt and in any amount. The Fourth Amendment also allowed Yucaipa's First Lien Debt to be counted as part of the Requisite Lender calculation and have voting power. (*See* Fourth Amendment at § 2.1(b)) No Lender other than ComVest consented to the Fourth Amendment. Contemporaneously with the execution of the Fourth Amendment, Yucaipa and ComVest executed an assignment agreement whereby Yucaipa agreed to acquire obligations owned by ComVest – including LC Commitments and Term Loans in excess of the limits imposed by the Third Amendment – for a combination of cash and future consideration.

Based upon the execution of the Fourth Amendment and the acquisition of ComVest's position of 55% of Allied's total First Lien Debt, Yucaipa – Allied's controlling shareholder – claimed that it was the Requisite Lender, with all of the attendant powers to enforce, or refuse to enforce, the Lenders' rights and remedies. (*See* Yucaipa at 10) As such, Yucaipa purportedly gained the ability to cause the Lenders to forbear from exercising their rights in the event of a default by Allied. Given Allied's struggles following its exit from its first bankruptcy, this was a valuable power.

After Yucaipa declared itself the Requisite Lender, CIT Group Business Credit, Inc. ("CIT") – a Lender and the Administrative Agent under the FLCA – challenged Yucaipa's status as Requisite Lender, which led to a lengthy litigation in Georgia. (*See* Committee Action D.I. 255, Ex. 6, at 26) On December 5, 2011, CIT settled that litigation with Yucaipa

5

and Allied, in which CIT conceded that Yucaipa was the Requisite Lender. (*See* Yucaipa at 10, BD/S at 10 n.16)

## B. The New York Action

On January 17, 2012, BD/S commenced an action in New York state court (the "New York Court") against Yucaipa, seeking a declaration that the Fourth Amendment was void and that Yucaipa was not the Requisite Lender ("New York Action"). (*See* Committee Action, D.I. 255, Ex. 4, at 19) On August 27, 2012, BD/S filed a motion for summary judgment in the New York Action, arguing that the Fourth Amendment was not validly enacted because it had the effect of changing the definition of Requisite Lenders and thus the amendment required the consent of all of the Lenders pursuant to § 10.5(b)(ix) of the FLCA. (*Id.* Ex. 16 at 3) On November 19, 2012, Justice Ramos of the New York Court ruled from the bench and granted summary judgment in favor of BD/S, nullifying the Fourth Amendment. (*Id.* Ex. 16 at 36:11-13) The New York Court observed that the Fourth Amendment was Yucaipa's attempt to give itself "a free hand" and the ability to exercise "dictatorial powers with regard to [the] loan." (*Id.* at 26:18-25) In the written opinion that followed the oral ruling on March 8, 2013, Justice Ramos concluded that: (1) the previous Georgia litigation settlement did not bind Black Diamond (*see BDCM Opp. Fund II*, 2013 N.Y. Misc. LEXIS 1993 at *15-*16);[11] (2) the Fourth Amendment was "invalid and of no force or effect" because, pursuant to § 10.5 of the FLCA, enacting the Fourth Amendment required the unanimous consent of all Lenders, which was not given (*see id.* at *14); and (3)

---

[11] The New York Court found that CIT "expressly limited the release it gave under the Settlement Agreement to itself by providing that the limited release was made solely by CIT on its own behalf and not in a representative capacity." *BDCM Opp. Fund II*, 2013 N.Y. Misc. LEXIS 1993 at *15-*16. Accordingly, as the New York Court found, CIT's concession that Yucaipa is the Requisite Lender is not binding on the other Lenders. *Id.*

based on the invalidity of the Fourth Amendment, Yucaipa was not the Requisite Lender (see id. at *16).

Specifically, the New York Court found that "the Third Amendment prohibited Yucaipa from exercising any and all voting rights it would otherwise have as a Lender, including the right to consent to any amendment of the FLCA or the right to vote its debt in any Allied bankruptcy." Id. at *4-*5. The New York Court further found that the consent of each Lender was required to validly enact the Fourth Amendment because it "'affected' every Lender and had the 'effect' of amending the definition of Requisite Lenders." Id. at *13. Because Allied "did not obtain – or even seek – consent from any Lender other than ComVest," the Fourth Amendment "is not, and never was, effective under the plain terms of the [FLCA]," and "Yucaipa is not the Requisite Lender." Id. at *14-*16.

The First Department of the New York Supreme Court's Appellate Division ("New York Appellate Division") affirmed the New York Court's finding that the Fourth Amendment is void ab initio and that Yucaipa is not the Requisite Lender. BDCM Opportunity Fund II, LP v. Yucaipa Am. Alliance Fund I, LP, 112 A.D.3d 509, 509 (N.Y. App. Div. 2013). The New York Appellate Division's opinion, however, modified the New York Court's opinion in that it held there was a triable issue of fact as to whether Black Diamond waived the ability to challenge Yucaipa's status as Requisite Lender.[12] See id. at 511. The New York Court

---

[12] Despite the remaining issue of whether Black Diamond waived the ability to challenge Yucaipa's Requisite Lender status, the New York Action is concluded for all purposes relevant to this appeal. Even if Black Diamond did waive its right to challenge Yucaipa's claim to Requisite Lender status, the New York Appellate Division held that Spectrum did not waive its rights to challenge Yucaipa's status. See BDCM Opportunity Fund, 978 N.Y.S.2d at 13. Thus, because the New York Court determined that the Fourth Amendment required unanimous consent, any waiver by Black Diamond is irrelevant. See also Yucaipa American Alliance Fund I, LP v. SBDRE LLC, 2014 WL 5509787, *4 (Del. Ch. Oct. 31, 2014). In this appeal, Yucaipa does not challenge the bankruptcy court's application, by collateral estoppel, of the New York Court's holding that the Fourth Amendment is invalid.

of Appeals denied further review on April 3, 2014, thereby exhausting Yucaipa's appeals. *BDCM Opp. Fund II, LP v. Yucaipa Am. Alliance Fund I, LP,* 8 N.E.3d 849, 849 (N.Y. 2014).

On June 5, 2012 – following the resignation of CIT in May 2012, but prior to the New York Court's November 19, 2012 ruling – AMMC VIII, Limited ("AMMC") assigned $4,548,354 of First Lien Debt to BD/S (the "AMMC Trade") pursuant to certain LSTA trade confirmations (the "AMMC Trade Confirmations"). (*See* Committee Action D.I. No. 268, Ex. 9) The AMMC Trade Confirmations gave BD/S control over AMMC's First Lien Debt, including the power to direct AMMC to vote its First Lien Debt and/or exercise rights and remedies under the FLCA as BD/S saw fit. (*See id.*) After the New York Court's November 19, 2012 ruling that the Fourth Amendment was invalid, BD/S and AMMC – as Requisite Lenders – appointed Black Diamond Commercial Finance, L.L.C. and Spectrum Commercial Finance LLC as co-Administrative Agents (collectively, the "Successor Agents") on or about December 3, 2012. (*Id.* Ex. 10) Thereafter, the Successor Agents registered the AMMC Trade on Allied's books and records. (*Id.* ¶ 16)

## C. The Bankruptcy Cases

On May 17, 2012, while the New York litigation was pending, Black Diamond filed an involuntary petition for bankruptcy against Allied in the bankruptcy court, and Allied entered bankruptcy for the second time, five years after its first bankruptcy. (*See* Bankr. D.I. 1) On October 18, 2012, Allied commenced an adversary proceeding seeking a determination as to, among other things, the identity of the Requisite Lenders under the FLCA (Adv. Proc. No. 12-50947 (CSS)) (the "Allied Action"). On March 14, 2013, the Official Committee of Unsecured Creditors appointed on behalf of Allied's bankruptcy estates (the "Committee"), together with BD/S (as intervenors), filed an Amended Complaint in the bankruptcy court seeking, among other things, to equitably subordinate Yucaipa's purported First Lien Debt and to compel Yucaipa to comply with the Third Amendment's requirement that Yucaipa

8

contribute its debt to capital (Adv. Proc. No. 13-50530 (CSS)) (the "Committee Action"). The Allied Action and the Committee Action remain pending in the bankruptcy court.

The bankruptcy court issued an oral ruling on February 27, 2013, granting a motion to dismiss Yucaipa's cross-claims in the Allied Action, including Yucaipa's claim for declaratory relief that certain provisions of the Third Amendment should be deemed void. (See Committee Action D.I. 255 at 103-08) On June 19, 2013, the bankruptcy court entered an agreed scheduling order in the Allied Action and Committee Action in which the parties (including Yucaipa) acknowledged that the bankruptcy court may address the issue of "[w]ho, if anyone, is 'Requisite Lender' under the Debtors' [FLCA].'" (See Committee Action D.I. 268 ¶¶ 2(a), (b)) Thereafter, BD/S filed a motion for summary judgment in both the Allied Action and Committee Action seeking a declaration that BD/S are the Requisite Lenders under the FLCA. (See Committee Action D.I. 254)

After full briefing, the bankruptcy court, on July 30, 2013, ruled from the bench that BD/S are the Requisite Lenders. (7/30/13 Hr'g. Tr. at 120:11-13) Relevant to this appeal, the bankruptcy court found that the FLCA and Third Amendment "are not ambiguous in any way, and the Court can . . . make its determination based on the four corners of the document[s]." (Id. at 122:15-18) The bankruptcy court further found that "Yucaipa is collaterally estopped" from asserting that the Fourth Amendment is valid in light of the New York Court's declaration that it is void ab initio. (Id. at 124:13-15) The bankruptcy court found that the Third Amendment was validly enacted with majority Lender consent because it "affected no lender." (Id. at 126:11-15) Rather, the Third Amendment affected only Yucaipa because it "allowed Yucaipa to purchase very limited amounts of term loans, and by Yucaipa's own admission, imposed onerous restrictions on such purchases that prohibited Yucaipa from ever becoming requisite lender." (Id.) "[A]s a result, the consent of the requisite lender was sufficient" to validly enact the Third Amendment. (Id. at 126:16-18.)

9

Accordingly, "[u]pon acquiring the debt, Yucaipa subjected itself to the [FLCA] and all of the amendments, including the [T]hird [A]mendment." (Id. at 127:13-15)

In applying the Third Amendment to determine the identity of the Requisite Lenders, the bankruptcy court began its analysis with § 2.1(e) of the Third Amendment, which changed the definition of Term Loan Exposure to provide that "with respect to any provisions of this Agreement relating to the voting rights of Lenders, ... the aggregate outstanding principal amount of the Term Loans of all Restricted Sponsor Affiliates [Yucaipa] shall be disregarded for purposes of this definition[.]" (See Third Amendment at § 2.1(e)) The bankruptcy court found that the "effect of 2.1(e) is that all of the Yucaipa debt cannot be used in determining who the requisite lender is ...." (Id. at 126:19-25) The bankruptcy court further found that the Third Amendment "prohibited Yucaipa from acquiring any revolving loans, and letters of credit, which would [exclude] those to the extent they exist from the denominator in figuring out the requisite lender." (Id. at 127:3-6) The bankruptcy court also observed that, "looking at the document as a whole," the Third Amendment's various restrictions and conditions on Yucaipa's ability to acquire and vote First Lien Debt "remove Yucaipa from being able to act as the requisite lender." (Id. at 127:7-12)

The bankruptcy court also observed that even if the Third Amendment were not valid, under the FLCA, "Yucaipa cannot be the requisite lender because it's not a lender as an implied term, as it's not an original lender or [an Eligible Assignee]." (Id. at 127:15-20) The bankruptcy court also "overrule[d] the argument that the [AMMC] debt cannot be included" with BD/S's holdings for purposes of the Requisite Lender calculation. (Id. at 128:15-17) The bankruptcy court found that when the New York Court invalidated the Fourth Amendment, "Black Diamond and Spectrum became [R]equisite [L]ender" even though "that hasn't been determined by a court of law until today." (Id. at 128:7-10) "And

10

after that point, [BD/S] acted to appoint an agent" to properly register the AMMC Trade. (*Id.* at 128:12-14) Thus, under the bankruptcy court's holding, BD/S are the Requisite Lenders because, when Yucaipa's First Lien Debt is subtracted from the denominator of the Requisite Lender calculation, and BD/S's AMMC debt is included in the numerator, BD/S collectively holds more than 50% of the aggregate First Lien Debt, as follows:



| BD/S debt ($51,938,610)<br>+ AMMC debt ($4,548,354) | $56,486,964 | = 51.7% |
|---|---|---|
| Total First Lien Debt ($244,047,530)<br>– Yucaipa debt ($134,835,690) | $109,211,840 | |

Following the bankruptcy court's ruling that BD/S are the Requisite Lenders, in the summer of 2013, the bankruptcy court supervised an auction of Allied's assets in which BD/S, in their capacity as Requisite Lenders, submitted a credit bid to purchase Allied's assets on behalf of the Lenders. Ultimately, Jack Cooper Holdings Corp. made the highest and best bid and purchased substantially all of Allied's assets, and that sale closed on December 20, 2013 and was funded on December 27, 2013. BD/S, in their capacity as Requisite Lenders, used their credit bid, which was approved by the bankruptcy court on September 17, 2013, to purchase the remainder of Allied's assets (the "SBDRE Assets") on behalf of all Lenders (including Yucaipa). (*See* Bankr. D.I. 1837, 1868 (sale orders))

On December 11, 2013, Yucaipa filed an action in the Delaware Court of Chancery against BD/S and others to challenge the allocation of the SBDRE Assets. On October 31, 2014, the Delaware Court of Chancery dismissed most of Yucaipa's claims by applying the bankruptcy court's decision through collateral estoppel that the Third Amendment is valid (the same decision from which Yucaipa now appeals). *Yucaipa Am. Alliance Fund I, LP v. SBDRE LLC*, No. 9151-VCP, 2014 WL 5509787, at *14 (Del. Ch. Oct. 31, 2014). The

claims that were not dismissed by the Court of Chancery were stayed pending resolution of Allied's chapter 11 cases. *See id.* at \*16-\*17.

On December 9, 2015, a plan of reorganization co-sponsored by BD/S in their capacity as the Requisite Lenders was approved by the bankruptcy court, and the Allied bankruptcy cases are in the process of winding up pursuant to the plan. (*See* Bankr. D.I. 3383) The plan of reorganization, which was supported by both Allied and the Committee, includes the prosecution of claims against Yucaipa and certain of its principals for equitable subordination, breach of contract, breach of fiduciary duty, and other claims.

## III. STANDARDS OF REVIEW

This court has jurisdiction to review the bankruptcy court's order pursuant to 28 U.S.C. § 158(a). In reviewing a bankruptcy court's grant of summary judgment, this court applies a plenary, or *de novo*, standard of review to legal determinations. *Biase v. Congress Fin. Corp. (In re Tops Appliance City, Inc.*), 372 F.3d 510, 513 (3d Cir. 2004); *Am. Flint Glass Workers Union v. Anchor Resolution Corp.*, 197 F.3d 76, 80 (3d Cir. 1999). Under that standard, courts look to whether the record demonstrates "a genuine issue of material fact and, if not, whether the moving party is entitled to judgment as a matter of law." *Saldana v. Kmart Corp.*, 260 F.3d 228, 232 (3d Cir. 2001). A disputed fact is "material" if it would affect the outcome of the suit as determined by the substantive law. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). Courts must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor. *Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1078 (3d Cir. 1992).

## IV. ISSUES RAISED ON APPEAL

Yucaipa raises the following issues on appeal in its opening brief:[13]

(1) Whether the bankruptcy court erred in granting summary judgment based on its conclusion that the FLCA and related amendments are unambiguous?

(2) Whether the bankruptcy court erred in granting summary judgment based on its conclusion that unanimous written lender consent was not necessary to adopt the Third Amendment to the FLCA?

(3) Whether the bankruptcy court erred in granting summary judgment based on its conclusion that pursuant to the FLCA Yucaipa was unable to act as Requisite Lender?

(4) Whether the bankruptcy court erred in granting summary judgment based on its conclusion that Yucaipa's holdings under the FLCA should not be included for the purpose of calculating the Requisite Lender?

(5) Whether the bankruptcy court erred in granting summary judgment based on its conclusion that New York law dictating that an assignment made in contravention of a contractual provision is valid unless the contract also contains clear, definite and appropriate language declaring such assignment void or invalid was inapplicable to this case?

(6) Whether the bankruptcy court erred in granting summary judgment based on its conclusion that debt owned by AMMC can be included in BD/S's holdings for the purpose of calculating the Requisite Lender?

---

[13] Yucaipa designated five additional issues for appeal, including: (i) whether the bankruptcy court erred in granting summary judgment based on its conclusion that the issue of a determination of Requisite Lender status is not time barred; (ii) whether the bankruptcy court erred in granting summary judgment based on its conclusion that Yucaipa is collaterally estopped from asserting the validity of the Fourth Amendment to the FLCA; (iii) whether the bankruptcy court erred in granting summary judgment based on its conclusion that summary judgment can properly be granted on claims and/or issues; (iv) whether the bankruptcy court erred in overruling Yucaipa's objections to BD/S's admission and reliance upon evidence that was the subject of discovery requests by Yucaipa upon BD/S which BD/S refused to produce; and (v) whether the bankruptcy court erred in overruling Yucaipa's objections to BD/S's admission and reliance upon evidence that was not properly authenticated. (See D.I. 3) These issues were not addressed in Yucaipa's opening brief. (See D.I. 17) "Because Appellant did not pursue these arguments, the Court considers them abandoned and waived." See In re Flintkote Co., 533 B.R. 887, 893 (D. Del. 2015) (citing Kost v. Kozakiewicz, 1 F.3d 176, 182 (3d Cir. 1993) (stating issues on appeal must be identified and supported with argument or else they are waived)).

(7) Whether the bankruptcy court erred in overruling Yucaipa's objections to BD/S's admission and reliance upon evidence that was admitted in the first instance at the reply stage of BD/S's motion for summary judgment?

(8) Whether the bankruptcy court erred in granting the motion for summary judgment based on its conclusion that BD/S are the Requisite Lenders?

## V. DISCUSSION

### A. Whether the Bankruptcy Court Erred in Granting Summary Judgment Based on its Conclusion that the FLCA and Related Amendments Are Unambiguous?

In addressing the motion for summary judgment, the bankruptcy court began its analysis by citing *World-Wide Rights*, which notes that "[a] court faces a conceptually difficult task in deciding whether to grant summary judgment on a matter of contract interpretation. Only an unambiguous writing justifies summary judgment without resort to extrinsic evidence, and no writing is unambiguous if susceptible of two reasonable interpretations." (*See* 7/30/13 Hr'g. Tr. at 123:3-13 (quoting portions of *World-Wide Rights Ltd. Partnership v. Combe Inc.*, 955 F.2d 245, 245 (4th Cir. 1992) (internal quotation marks and citations omitted)). "The first step for a court asked to grant summary judgment based on a contract's interpretation is, therefore, to determine whether, as a matter of law, the contract is ambiguous or unambiguous on its face. If a court properly determines that the contract is unambiguous on the dispositive issue, it may then properly interpret the contract as a matter of law and grant summary judgment because no interpretive facts are in genuine issue." *See World-Wide Rights*, 955 F.2d at 245. The bankruptcy court further observed that ambiguity is not determined just because the parties to the contract have differing interpretations. (*See* 7/30/13 Hr'g. Tr. at 123:16-18) The bankruptcy court ultimately concluded that "the contracts are not ambiguous in any way, and the Court can ... make its determination based on the four corners of the document." (*See id.* at 122:15-18)

In the proceedings below, Yucaipa did not argue that any of the terms of the FLCA or Third Amendment were ambiguous. On appeal, Yucaipa argues that the Third

14

Amendment's terms are ambiguous and required the bankruptcy court to assess extrinsic evidence to determine the parties' intent, which could not be resolved against Yucaipa on summary judgment. (See Yucaipa at 15). Specifically, Yucaipa argues that the definition of "Term Loan Exposure" in § 2.1(e) of the Third Amendment is ambiguous.

Under the FLCA, Requisite Lenders are: "one or more Lenders having or holding **Term Loan Exposure**, LC Exposure and/or Revolving Exposure and representing more than 50% of the sum of (i) the aggregate **Term Loan Exposure** of all Lenders, (ii) the aggregate LC Exposure of all Lenders and (iii) the aggregate Revolving Exposure of all Lenders." (Id. at § 1.1 (emphasis added)) Thus, the definition of Term Loan Exposure is critical to the definition of Requisite Lenders.

The FLCA as originally drafted expressly prohibited Yucaipa from being assigned any Allied debt whatsoever (see FLCA at § 1.1 (expressly excluding Yucaipa from definition of Eligible Assignee)). Thus, Term Loan Exposure was originally defined in the FLCA as follows: "[W]ith respect to any Lender, as of the date of determination, the outstanding principal amount of the Term Loans of such Lender …." (Id.) The Third Amendment, which permitted Yucaipa to acquire limited amounts of Term Loans subject to certain limitations and restrictions, designated Yucaipa and its affiliates as "Restricted Sponsor Affiliates" (see Third Amendment at § 2.1(a)) and amended the definition of Term Loan Exposure to exclude Yucaipa's Term Loans with respect to any provisions of the FLCA relating to the Lenders' voting rights (see id. at § 2.1(e)). The full text of § 2.1(e) of the Third Amendment provides:

> "**Term Loan Exposure**" means, with respect to any Lender, as of any date of determination, the outstanding principal amount of the Term Loans of such Lender plus during the Term Loan Commitment Period, the unfunded Term Loan Commitment of such Lender; provided, at any time prior to the making of the initial Term Loans, the Term Loan Exposure of any Lender shall be equal to such Lender's Term Loan Commitment; **provided further that with respect to any provisions of this Agreement related to the voting rights**

15

**of Lenders** (including the right of Lenders to consent or take any other action with respect to any amendment, modification, termination or waiver of any provision of this Agreement or the other Credit Documents, or consent to any departure by any Credit Party therefrom), **the aggregate outstanding principal amount of the Term Loans of all Restricted Sponsor Affiliates [Yucaipa] shall be disregarded for purposes of this definition of "Term Loan Exposure."**

(Third Amendment at § 2.1(e) (emphasis added)).

Yucaipa argues that the definition of "Term Loan Exposure" in § 2.1(e) of the Third Amendment did not preclude Yucaipa from becoming Requisite Lender because that provision excluded Yucaipa's Term Loans only "with respect to any provisions of this Agreement **relating to the voting rights of Lenders**," and the definition of Requisite Lenders "does not refer or relate to voting rights." (*See* Yucaipa at 27) Yucaipa further argues that the definition of "Term Loan Exposure" in § 2.1(e) of the Third Amendment is at least ambiguous "to the extent that the Third Amendment lacks definite and precise language stating that Yucaipa's Term Loan Exposure should be excluded from the Requisite Lender calculation" and that "[i]f the bankruptcy court had recognized ambiguity in the record, it should have resolved the ambiguity in Yucaipa's favor or at least allowed the matter to proceed past summary judgment." (*See id.* at 3, 30) Yucaipa argues that, because the definition of Term Loan Exposure is ambiguous, the bankruptcy court should have accepted "available extrinsic evidence to ascertain the meaning intended by the parties during the formation of the contract." (*See id.* at 30 (citing *Morgan Stanley Grp. Inc. v. New England Ins. Co.*, 225 F.3d 270, 275-76 (2d Cir. 2000)) Yucaipa further argues that the available extrinsic evidence "demonstrates that the drafters and signatories of the Third Amendment did not intend to exclude Yucaipa's first lien debt obligations from the denominator of the Requisite Lender calculation" because "[a]t least one draft of the Third Amendment contained language expressly excluding Yucaipa's debt holdings from the definition of Requisite Lender," but that modification was rejected. (*See id.* at 30-31)

16

Conversely, BD/S argues that the Requisite Lenders provision is clearly a provision "relating to the voting rights of Lenders," thus, Yucaipa's holdings must be excluded from Term Loan Exposure for purposes of the Requisite Lender calculation pursuant to the clear language of § 2.1(e). BD/S argues that § 2.1(e)'s definition of "Term Loan Exposure" is unambiguous; therefore, the bankruptcy court was correct to interpret the document without reference to extrinsic evidence. (See BD/S at 24-25) BD/S further argues that, even if the court were to rely on extrinsic evidence, the drafts proffered by Yucaipa demonstrate that the language excluding Yucaipa's debt holdings from the definition of Requisite Lender was likely stricken because it was surplusage in light of the clear voting rights restrictions otherwise contained in the Third Amendment. (See id.)

The court agrees with the bankruptcy court's finding that, as a matter of law, § 2.1(e) of the Third Amendment is unambiguous as to the dispositive issue here, that is, whether Yucaipa's Term Loans must be disregarded from Term Loan Exposure for purposes of the Requisite Lender determination. A contract is unambiguous where the contract's terms have "a definite and precise meaning, as to which there is no reasonable basis for a difference of opinion." In re Lehman Bros. Inc., 478 B.R. 570, 586 (S.D.N.Y. 2012). The Requisite Lender has the power to make amendments, modifications, and waivers of the FLCA, thereby affecting the rights and remedies of all Lenders; that power can be exercised only by voting. The court sees no reasonable basis for a difference of opinion that the Requisite Lender determination is a provision "related to the voting rights of the Lenders." Yucaipa's Term Loans must be disregarded from Term Loan Exposure for purposes of the Requisite Lender calculation under the "definite and precise" terms of the Third Amendment. See Lehman at 586.

The court is not persuaded by Yucaipa's argument that Term Loan Exposure excluded Yucaipa's Term Loans only "with respect to any provisions of this Agreement

17

relating to the voting rights of Lenders," and that the definition of Requisite Lenders "does not refer or relate to voting rights." (*See* Yucaipa at 27) The New York Court rejected this interpretation as well, finding Yucaipa's argument that the determination of Requisite Lender had nothing to do with voting rights "not logical." (*See* Committee Action D.I. 255, Ex. 16 at 23:23-24) Justice Ramos recognized the Requisite Lenders can only exercise their rights through voting. (*Id.* at 24:13-18 ("Are you saying that [Requisite Lenders] don't have the power to make the amendments, modifications or waivers that [Black Diamond and Spectrum are] complaining about? Of course they do. . . . They do that by voting.").

In addition, as BD/S argues, Yucaipa's proposed interpretation would render superfluous the FLCA's prohibition on Yucaipa's right to vote any debt it acquired and the numerous other restrictions on Yucaipa as a "Restricted Sponsor Affiliate" under §§ 2.7(a), (b) and (e) of the Third Amendment.[14] (*See* BD/S at 22 (citing *Pearce, Urstadt, Mayer & Greer Realty Corp. v. Atrium Dev. Assocs.*, 77 N.Y.2d 490, 497 (1991) (holding that a court "cannot and should not accept an interpretation that ignores the interplay of terms, renders certain terms 'inoperable,' and creates a conflict where one need not exist")).

The court finds that the Third Amendment is not ambiguous because it is not susceptible of two reasonable interpretations. *See World-Wide*, 955 F.2d at 254. Because

---

[14] The Third Amendment provides that Yucaipa "shall have **no voting rights for all purposes** under this Agreement (whether **before, during or after an Insolvency or Liquidation Proceeding**)." (*See* Third Amendment at § 2.7(a) (emphasis added)) The Third Amendment further provides that Yucaipa "**irrevocably and voluntarily waive[s]** . . . any right to, make any election, give any consent, commence any action or file any motion, claim, obligation, notice or application or take any other action **in any Insolvency or Liquidation Proceeding** without the prior written consent of all Lenders other than [Yucaipa]." (*Id.* at § 2.7(b) (emphasis added)) The Third Amendment provides as well that, with respect to the limited amount of Term Loans that Yucaipa was permitted to acquire, Yucaipa "**knowingly and irrevocably waives any and all rights to exercise any voting rights it would otherwise have as a Lender for all purposes**." (*Id.* at § 2.7(e)(iv) (emphasis added))

the Third Amendment is complete, clear, and unambiguous on its face and as to the

dispositive issue, the bankruptcy court had no need to consider extrinsic evidence in

interpreting this provision. Contrary to Yucaipa's argument, extrinsic evidence is not

admissible to create an ambiguity in a written agreement which is complete and clear and

unambiguous upon its face." *See Reiss v. Fin. Performance Grp.*, 97 N.Y.2d 195, 199 (N.Y.

Ct. App. 2001). Here, no interpretive facts were in genuine issue, and it was proper for the

bankruptcy court to interpret the Third Amendment as a matter of law and grant summary

judgment. *See World Wide,* 955 F.2d at 245.

## B. Whether the Bankruptcy Court Erred in Granting Summary Judgment Based on its Conclusion that Unanimous Written Lender Consent Was Not Necessary to Adopt the Third Amendment to the FLCA?

Generally, amendments to the FLCA require only majority or Requisite Lender

consent, which is what was obtained for passage of the Third Amendment. (*See* FLCA §

10.5(a)) For certain other amendments, however, the consent of each Lender "affected

thereby" is required. (*See id.* §§ 10.5(b) and (c)) The FLCA provides: "Without the written

consent of each Lender ... that would be affected thereby, no amendment, modification,

termination, or consent shall be effective if the effect thereof would: amend the definition of

'Requisite Lenders' or 'Pro Rata Share' ...." (*Id.* at § 10.5(b)(ix))

As discussed above, Requisite Lenders are: "one or more Lenders having or holding

**Term Loan Exposure**, LC Exposure and/or Revolving Exposure and representing more

than 50% of the sum of (i) the aggregate **Term Loan Exposure** of all Lenders, (ii) the

aggregate LC Exposure of all Lenders and (iii) the aggregate Revolving Exposure of all

Lenders." (*Id.* at § 1.1 (emphasis added)) Pro Rata Share means (i) with respect to all

payments, computations and other matters relating to the Term Loan of any Lender, the

percentage obtained by dividing (a) the **Term Loan Exposure** of that Lender by (b) the

aggregate **Term Loan Exposure** of all Lenders[.]" (*Id.* (emphasis added)) Term Loan

19

Exposure is critical to the definitions of both Requisite Lenders and Pro Rata Share. Pursuant to § 10.5(b)(ix), the consent of each Lender that would be "affected thereby" is required for the amendment of either definition of Requisite Lenders or Pro Rata Share.

As noted above, the original FLCA expressly prohibited Yucaipa from being assigned any Allied debt whatsoever, and defined Term Loan Exposure to mean "with respect to any Lender, as of the date of determination, the outstanding principal amount of the Term Loans of such Lender ...." (*Id.*) The Third Amendment, which permitted Yucaipa to acquire limited amounts of Term Loans subject to certain restrictions, amended the definition of Term Loan Exposure to exclude Yucaipa's Term Loans with respect to any provisions of the FLCA relating to the Lenders' voting rights (*see id.* at § 2.1(e)). The subsequent Fourth Amendment, on the other hand, contemplated giving Yucaipa unlimited rights to acquire and vote Allied debt and reinstated the original definition of Term Loan Exposure, which removed the Third Amendment's provision that Yucaipa's holdings would be disregarded for purposes of Term Loan Exposure. (*See* Fourth Amendment at § 2.1(b))

In the New York Action, Justice Ramos concluded that the Fourth Amendment's change to Term Loan Exposure, which would have removed all restrictions on Yucaipa's ability to acquire and vote First Lien Debt, had the effect of amending the definition of Requisite Lenders because it "allow[ed] the Yucaipa-owned Obligations to be included in the calculation of Term Loan Exposure when under the Third Amendment, they had previously been expressly excluded." *See BDCM Opp. Fund II*, 2013 N.Y. Misc. LEXIS 1993, at *14. As such, Justice Ramos concluded that the Fourth Amendment affected every Lender and required unanimous Lender consent. *See id.* Because such consent was not obtained and the Fourth Amendment was passed with Requisite Lender consent only, Justice Ramos declared the Fourth Amendment void. *See id. at* *16.

In ruling on the motion for summary judgment, the bankruptcy court found that the Third Amendment, unlike the Fourth Amendment, was validly enacted with Requisite Lender consent only because the Third Amendment "affected no lender, but it only allowed Yucaipa to purchase very limited amounts of term loans, and by Yucaipa's own admission, imposed onerous restrictions on such purchases that prohibited Yucaipa from ever becoming requisite lender. The only party affected was Yucaipa, and as a result, the consent of the requisite lender was sufficient, and all the lenders did not have to agree." (See 7/30/13 Hr'g Tr. at 126:11-18) The bankruptcy court concluded that the Third Amendment was validly enacted with Requisite Lender consent only. (See id.)

On appeal, Yucaipa argues that the bankruptcy court erred in finding that the Third Amendment did not require unanimous Lender consent as required by § 10.5(b)(ix) of the FLCA. (See Yucaipa at 2) First, Yucaipa argues that if even if the Third Amendment's change to the definition of Term Loan Exposure served to exclude Yucaipa's debt from the Requisite Lender calculation, it also effectively changed the definition of two terms – Requisite Lenders and Pro Rata Share – both of which require unanimous affected Lender consent under § 10.5(b)(ix). (See Yucaipa at 17) Yucaipa asserts that the change to Term Loan Exposure altered the definition of "Requisite Lenders" because it "effectively narrowed the pool of debt to be considered for purposes of determining the Requisite Lender." (See id.) Likewise, the definition of Pro Rata Share was also altered because "[i]t effectively reduced the 'aggregate Term Loan Exposure' of all Lenders." (See id.) As a result, Yucaipa argues that the Third Amendment is invalid because it was not passed with unanimous consent of all affected Lenders as required by § 10.5(b)(ix). (See id.)

In response, BD/S argues that the Third Amendment's change to the definition of Term Loan Exposure did not have the effect of changing the definition of Requisite Lenders because the Third Amendment's modification of Term Loan Exposure merely prohibits

Yucaipa's Term Loans from being counted for voting purposes and does not change the definition of that term. (See BD/S at 19) BD/S further argues that Pro Rata Share is an economic computation whose definition was not affected at all by the Third Amendment. (See id.) According to BD/S, the Third Amendment did not have the effect of changing the definitions of either of those terms; "rather, if Yucaipa acquired any Term Loans, the Third Amendment's change to Term Loan Exposure merely affected the computation for determining Pro Rata Share and Requisite Lenders, while the definitions of those terms remain unchanged. (See id.)

The court agrees that the Third Amendment's change to the definition of Term Loan Exposure did not have the effect of amending the definitions of Requisite Lender or Pro Rata Share. In contrast, the Fourth Amendment's change to the definition of Term Loan Exposure permitted Yucaipa's First Lien Debt to be counted as part of the Requisite Lender calculation. This was a fundamental change which certainly had the effect of changing the definition of Requisite Lender because it "ostensibly strip[ped] out all of the restrictions incorporated into the [FLCA] by the Third Amendment on the ability of [Yucaipa] as the 'Sponsor' and majority shareholder to acquire more than a majority of the Term Loans and become 'Requisite Lender.'" See BDCM Opp. Fund I, LP, 2013 N.Y. Misc. LEXIS 1993 at *11. On the other hand, the Third Amendment's change to the definition of Term Loan Exposure simply changed the computation for calculating Pro Rata Share and determining the Requisite Lenders – leaving those definitions unchanged – and unanimous Lender consent to those changes, therefore, was not required.

Even assuming the Third Amendment's change to Term Loan Exposure did have the effect of amending the definitions of Requisite Lender or Pro Rata Share, those changes only affected Yucaipa. Consent to amend the definition of Requisite Lender is required only by the Lenders "affected thereby" under § 10.5(b)(ix) of the FLCA, and Yucaipa has failed to

22

identify any way in which the Third Amendment affected any other Lender, asserting essentially the same arguments as above. Yucaipa argues that the Third Amendment's modification of "Term Loan Exposure" to exclude Yucaipa's debt affected all Lenders because that change (i) narrowed the pool of debt to be considered for purposes of the Requisite Lender determination, and (ii) reduced the denominator for purposes of computing each Lender's Pro Rata Share ownership under the FLCA. (See Yucaipa at 21) Yucaipa argues that the FLCA does not state that an amendment to the definition of Requisite Lenders or Pro Rata Share must negatively affect Lenders in order to trigger the requirement of unanimous Lender consent, only that the amendment must "produce a material influence upon or alteration in" the Lenders. (See id. at 22 (quoting dictionary definition of "affect" to determine plain meaning of contract's terms)

The court disagrees. The Fourth Amendment affected every Lender (requiring unanimous Lender consent) because the change to the definition of Term Loan Exposure allowed Yucaipa, a majority shareholder, to vote and become Requisite Lender for the first time and exercise the rights (or forebear from exercising the rights) of all Lenders. As BD/S argues, "[i]t is hard to imagine a more fundamental change to the definition of Requisite Lenders than one that allows for the first time the Sponsor – who initially was specifically excluded from ever becoming a Lender, due to its obvious conflicting interests from the First Lien Lenders – to be eligible to be the Requisite Lender." (See id. at 17) Conversely, the Third Amendment's provision that Yucaipa could become a Lender and acquire limited Term Loans – which could not be voted for any purpose – in no way affected the rights of Lenders other than Yucaipa. Similarly, the Third Amendment's provision that Term Loans acquired by Yucaipa were expressly disregarded for purposes of Term Loan Exposure and could not be counted in the Requisite Lender calculation affected Yucaipa only.

The court is persuaded that, when the FLCA is viewed as a whole, the parties' intent was to prohibit Yucaipa from ever becoming the Requisite Lender. *See Eitan Ventures, LLC v. Peeled, Inc.*, 94 A.D.3d 614, 616 (N.Y. App. Div. 2012) (courts should "examine the contract as a whole and interpret its parts with reference to the whole" to ascertain the parties' intent); *Richard Feiner and Co., Inv. v. Paramount Pictures Corp.*, 95 A.D.3d 232, 237-38 (N.Y. App. Div. 2012) (intention of the parties to a contract must be ascertained not from one provision but from entire instrument). Yucaipa could not become Requisite Lender prior to the Third Amendment because it was prohibited from buying any First Lien Debt, nor could it become Requisite Lender after the Third Amendment due to the restrictions and limitations contained therein. Therefore, Lenders other than Yucaipa were unaffected by the Third Amendment and their unanimous consent was not required.

Second, Yucaipa argues that the bankruptcy court failed to consider the Third Amendment's change to the term "Lender" which, Yucaipa argues, also had the effect of amending the definition of Requisite Lender. (*See id.* at 16) Yucaipa argues that the Third Amendment modified various defined terms in the FLCA to explicitly permit Yucaipa to become a Lender, which is a necessary prerequisite to becoming a Requisite Lender. (*See* Yucaipa at 18) The original FLCA defined Lender to mean "each financial institution listed on the signature pages hereto as a Lender, and any other Person that becomes a party hereto pursuant to an Assignment Agreement." (FLCA § 1.1) The Third Amendment: changed the definition of "Eligible Assignee" by removing the clause that excluded Yucaipa from that definition for purposes of acquiring Term Loans (*see* Third Amendment at § 2.1(c)); amended the definition of "Assignment Agreement" to allow Yucaipa to acquire First Lien Debt (*see id.* at § 2.1(b)); and stated that its primary purpose was to expressly allow Yucaipa to become a Lender (*see id.* at 1 (Recitals); § 2.7(e)). Thus, Yucaipa argues, the Third Amendment "effectively amend[ed] the definition of 'Requisite Lenders' because it

24

changed the definition of the term 'Lender' – the key component of the 'Requisite Lenders' definition – to expressly include Yucaipa." (See Yucaipa at 19; Yucaipa R. at 5)

Conversely, BD/S argues that, due to the numerous restrictions on Yucaipa's ability to become a Lender which were contained in the Third Amendment, the Third Amendment's change to the definition of Lender did not have the effect of amending the definition of Requisite Lender. (See BD/S at 18) BD/S argues that the Third Amendment: prohibited Yucaipa from buying sufficient debt to ever become the Requisite Lender (see Third Amendment, §§ 2.1(c), 2.7(c), 2.7(e)); prohibited Yucaipa from exercising any voting rights (see id. at §§ 2.7(a), 2.7(b), 2.7(e)), thereby "neutering" any debt it acquired; and provided that any Term Loans acquired by Yucaipa were excluded from the Requisite Lender calculation (see id. § 2.1(e)). In light of these restrictions, BD/S argues that the Third Amendment did not have the effect of changing the definition of Requisite Lenders. (See BD/S at 18-19)

The court is not persuaded by Yucaipa's argument that the Third Amendment effectively amended the definition of Requisite Lenders simply because it allowed Yucaipa to become a Lender. The Third Amendment specifically prohibited Yucaipa from buying sufficient debt to ever become the Requisite Lender and stripped Yucaipa's debt of any voting rights. As discussed above, the court finds that the Third Amendment also provided that Yucaipa's holdings would be disregarded from the Term Loan Exposure component of the Requisite Lender calculation. The Third Amendment's changes permitting Yucaipa to become a Lender who can only hold a limited amount of debt without voting rights did not have the effect of amending the definition of Requisite Lenders.

Even assuming that the Third Amendment's change to the definition of Lender did have the effect of amending the definition of Requisite Lenders, the only Lender affected by this change was Yucaipa. Yucaipa argues that the Third Amendment's modification to

25

Lender affected all Lenders in two ways. First, Yucaipa argues, the Third Amendment's modification to Lender specifically allowed Yucaipa to be included among the ranks of other Lenders for purposes of the Requisite Lender calculation. However, as set forth in the analysis above, the court agrees with the bankruptcy court's holding that the Third Amendment excluded Yucaipa's debt from Term Loan Exposure for purposes of the Requisite Lender calculation. Second, while the Third Amendment's restrictions may have prevented Yucaipa from becoming the Requisite Lender on its own, Yucaipa argues that the Third Amendment contained no provisions that restricted Yucaipa from combining its obligations with those of other Lenders to become part of a "Requisite Lender group." (*See* Yucaipa at 18) In the absence of such a restriction, this change affected all Lenders. (*See id.*; Yucaipa R. at 5)) The court rejects this contention as well. The Third Amendment did not permit Yucaipa to combine its holdings with other Lenders to become a Requisite Lender. Any attempt by Yucaipa to combine its holdings with another Lender (or group of Lenders) would be pointless where Yucaipa's debt must be excluded from the Requisite Lender calculation pursuant to § 2.1(e).

The court agrees that the Third Amendment's provision that Yucaipa could become a Lender and acquire limited Term Loans – which could not be voted for any purpose and could not be counted for purposes of the Requisite Lender determination – in no way affected the rights of Lenders other than Yucaipa. Because the Third Amendment did not affect any Lender other than Yucaipa, the court finds no error with the bankruptcy court's conclusion that unanimous Lender consent was not necessary to validly adopt the Third Amendment.[15]

---

[15] Yucaipa further argues that there is at least a triable issue of fact as to the effect of the Third Amendment on other Lenders, which precludes summary judgment. (*See* Yucaipa R. at 9-10) In support of this argument, Yucaipa argues that Black Diamond allegedly

26

### C. Whether the Bankruptcy Court Erred in Granting Summary Judgment Based on its Conclusion that Pursuant to the FCLA Yucaipa Was Unable to Act as Requisite Lender?

Yucaipa argues that the Third Amendment is invalid and, therefore, the FLCA becomes the operative instrument governing the Lenders' holdings in Allied. (*See* Yucaipa at 22 (citing *Leinwand v. Swan Coin-o-Matic Laundry, Inc.*, 496 N.Y.S.2d 118, 118 (N.Y. Sup. Ct. App. Div. 1985)). As part of its bench ruling, the bankruptcy court found that the numerous restrictions on Yucaipa's ability to acquire and vote First Lien Debt set forth in the Third Amendment "remove Yucaipa from being able to act as the requisite lender." (7/30/13 Hr'g. Tr. at 127:3-12) The bankruptcy court noted that even if the Third Amendment was invalid, "under the first amendment alone … Yucaipa cannot be the requisite lender because it's not a lender as an implied term, as it's not an original lender or [an Eligible Assignee]." (*Id.* at 127:16-20)

BD/S argues that under the original FLCA, the only parties eligible to act as Requisite Lenders were "Lenders," which consisted only of the original Lender signatories to the FLCA and "Eligible Assignees" that subsequently become Lenders pursuant to an Assignment Agreement. (*Id.* § 1.1 ("'Lender' means each financial institution on the signature pages hereto as a Lender, and any other Person that becomes a party hereto pursuant to an Assignment Agreement.")) Yucaipa was not an original Lender signatory to

---

questioned the validity of the Third Amendment based on the fact that it needed 100% vote to change the Requisite Lender definition. (*See* Yucaipa at 19; Yucaipa R. at 10, n.10.) BD/S argues that the FLCA and Third Amendment are not ambiguous, thus the Court should not consider extrinsic evidence. (*See* BD/S at 20 citing *Teitelbaum Holdings, Ltd. v. Gold*, 48 N.Y. 51, 56 (1979) ("Interpretation of an unambiguous contract provision is a function of the court, and matters extrinsic to the agreement may not be considered when the intent of the parties can be gleaned from the face of the instrument.")) As set forth herein, the court finds the documents are unambiguous, the intent of the parties can be gleaned from the face of the instruments, and the court finds no error in the bankruptcy court's summary judgment ruling.

the FLCA, nor could Yucaipa be an Eligible Assignee under the FLCA, because the definition expressly provided that "no . . . Sponsor shall be an Eligible Assignee." (Id.) "Sponsor" is a defined term applicable only to Yucaipa. (Id.) Accordingly, under the original FLCA, Yucaipa could not be an Eligible Assignee and, therefore, could not be a Lender or the Requisite Lender.

Yucaipa disagrees, arguing that under the FLCA, Yucaipa may have been excluded from the definition of "Eligible Assignee," but the FLCA defines a "Lender" as a "Person that becomes a party [to the FLCA] pursuant to an Assignment Agreement" and the definition of "Lender" does not incorporate or reference the term "Eligible Assignee." (Yucaipa at 23) Yucaipa posits that it acquired the majority of Allied's first lien debt pursuant to an Assignment Agreement, and became a "Lender" under the FLCA—and by virtue of the amount of first lien debt it acquired, the Requisite Lender—despite the FLCA's express exclusion of Yucaipa from the definition of "Eligible Assignee." (See id.) Yucaipa argues that while the Third Amendment expressly allowed Yucaipa to become a "Lender" by modifying the definition of "Assignment Agreement" and amending the definition of "Eligible Assignee" to include Yucaipa for the purposes of Term Loans, the FLCA did not expressly prohibit Yucaipa from becoming a Lender. (See id. at 23 n. 12) As a result, Yucaipa argues, the bankruptcy court erred in finding that "even under the first amendment alone ... Yucaipa cannot be the requisite lender because it's not a lender..." (7/30/13 Hr'g Tr. at 127:16-18)

BD/S argues that the terms Lender and Eligible Assignee are inextricably intertwined and are not "distinct definitions" as Yucaipa argues. (See BD/S at 32) Specifically, other than by being an original signatory Lender to the FLCA, the only way to become a Lender is to obtain an assignment of First Lien Debt pursuant to an Assignment Agreement. In turn, the only way to obtain an assignment of First Lien Debt pursuant to an Assignment

28

Agreement is to be an Eligible Assignee. (*See* FLCA §§ 1.1, 10.6(c), 10.6(d))  Contrary to Yucaipa's strained interpretation, BD/S argues, the FLCA unambiguously precludes and restricts Lenders from assigning any First Lien Debt to Yucaipa in particular because Yucaipa, the Sponsor, cannot be an Eligible Assignee.  (FLCA §§ 1.1, 10.6(c))  Indeed, BD/S argues, if Yucaipa could be a Lender under the original FLCA, then there was no need to enact the Third Amendment whose "primary purpose" (according to Yucaipa) "was to expressly allow Yucaipa to become a 'Lender.'" (*See* BD/S at 32-33, citing Yucaipa at 18)

The court need not address whether Yucaipa could be Requisite Lender under the original FLCA because the court finds no error in the bankruptcy court's conclusion that the Third Amendment was validly enacted and governs for purposes of the Requisite Lender determination.  The bankruptcy court's observation that Yucaipa could not have been a Requisite Lender under the original FLCA is *dicta* because it is not essential to the bankruptcy court's ultimate holding that the Third Amendment was validly exacted.  *See In re Friedman's, Inc.*, 738 F.3d 547, 552 (3d Cir. 2013) (a determination not necessary to ultimate holding is *dictum*).  Even assuming that the Third Amendment was invalid, however, and that the original FLCA was the operative document, the court would find no error in the bankruptcy court's observation that Yucaipa cannot be a Lender under the original FLCA and, thus, could not be Requisite Lender.  The court finds no ambiguity in the relevant provisions of the FLCA.  As Justice Ramos observed, "There is no credible dispute that under the terms of the [FLCA] as initially drafted and executed, [the Yucaipa entities], as the 'Sponsors' and controlling shareholders of [Allied] were absolutely prohibited from being a Lender to Allied, or an Eligible Assignee of a Lender, and thus could not acquire any Term Loans or other Obligations under the [FLCA]."  *See* 2013 N.Y. Misc. LEXIS 1993 at *9.  Because the original FLCA clearly prohibited Yucaipa from ever becoming a Lender,

Yucaipa could not have been the Requisite Lender under the FLCA either, as the definition

of Requisite Lenders provides that the Requisite Lenders can only be "one or more

Lenders...." (See FLCA at § 1.1)

## D. Whether the Bankruptcy Court Erred in Granting Summary Judgment Based on its Conclusion that Yucaipa's Holdings under the FLCA Should Not Be Included for the Purpose of Calculating the Requisite Lender?

As noted above, Requisite Lenders under the FLCA are

> one or more Lenders having or holding Term Loan Exposure, LC Exposure and/or Revolving Exposure and representing more than 50% of the sum of the (i) aggregate Term Loan Exposure of all Lenders, (ii) the aggregate LC Exposure of all Lenders and (iii) the aggregate Revolving Exposure of all Lenders.

(FLCA § 1.1) The parties concede that the aggregate First Lien Debt obligations under the

FLCA consist of $175,950,000 of Term Loan Exposure, $33,097,530 of LC Exposure, and

approximately $35,000,000 of Revolving Exposure, for a total of $244,047,530. (See

Yucaipa at 11) Yucaipa purports to hold $134,835,690 of First Lien Debt, including

$114,712,087 of Term Loans and $20,123,602 of LC Exposure. (See id.) In determining

that all of Yucaipa's holdings must be excluded from the denominator of the Requisite

Lender calculation, the bankruptcy court referred to § 2.1(e) as the "critical contractual

provision" underlying this issue. "[T]he effect of 2.1(e) is that all of the Yucaipa debt cannot

be used in determining who the requisite lender is. ..." (See 7/30/13 Hr'g. Tr. at 126:23-25)

BD/S argues that Yucaipa's debt holdings must be excluded entirely for purposes of

determining the Requisite Lender, and that the correct denominator of the Requisite Lender

calculation is $109,211,840. BD/S argues that under both the original FLCA and the Third

Amendment, Yucaipa was prohibited from acquiring any LC Commitments; thus, Yucaipa's

acquisition of the LC Commitments was invalid. BD/S further argues that ComVest's

assignment of Term Loans to Yucaipa was invalid to the extent that the assignment exceeded the limit that Yucaipa was permitted to acquire under the Third Amendment.

Conversely, Yucaipa asserts that it was improper for the bankruptcy court to exclude any of Yucaipa's debt from the Requisite Lender calculation, and that the bankruptcy court erred in applying $109,211,840 as the denominator. In support thereof, Yucaipa advances several arguments. First, Yucaipa argues that even assuming the Third Amendment was valid and the bankruptcy court correctly interpreted the Third Amendment's definition of Term Loan Exposure to exclude Yucaipa's Term Loans, the bankruptcy court erred in relying on that section as a basis to exclude Yucaipa's LC Commitments from the denominator of the Requisite Lender calculation. (See Yucaipa at 32) Yucaipa argues that § 2.1(e) of the Third Amendment, which provides that Yucaipa's Term Loans shall be disregarded for purposes of Term Loan Exposure with respect to voting rights provisions, defines Term Loan Exposure only, and that provision does not address LC Commitments. (See id.) The bankruptcy court, therefore, should not have excluded Yucaipa's LC Commitments from the Requisite Lender calculation based on § 2.1(e) alone.

The court is not persuaded by Yucaipa's argument. Under both the FLCA and the Third Amendment, Yucaipa was entirely prohibited from acquiring LC Commitments. Because Yucaipa was prohibited from purchasing LC Commitments, it was unnecessary for those same agreements to specify that Yucaipa's LC Commitments must be excluded from the Term Loan Exposure and Requisite Lender calculation. The only type of obligation that Yucaipa was permitted to acquire under the Third Amendment – a limited amount of Term Loans – was explicitly disregarded for all voting purposes pursuant to § 2.1(e) of the Third Amendment. As BD/S correctly notes, if Yucaipa cannot vote what it was permitted to own, it certainly cannot vote what it was forbidden from owning. (See MSJ at 30)

Yucaipa argues that even though the Third Amendment prohibited Yucaipa from acquiring any LC Commitments and Term Loans in excess of $50 million, the Requisite Lender had authority to override this prohibition by simply consenting to a modification of the form Assignment Agreement attached as Exhibit E to the FLCA. (*See* Yucaipa at 33) Yucaipa argues that the Third Amendment amended the definition of "Assignment Agreement" to state that "approval of the Requisite Lenders shall be required to amend or modify any provision of Exhibit E [an Assignment Agreement] that relates to [Yucaipa]." (Third Amendment, § 2.1(b))  Section 2.8 of the Third Amendment describes various amendments to the form Assignment Agreement at Exhibit E, and § 2.8(c) amended the Assignment Agreement to incorporate the limitation on the amount of Term Loans Yucaipa could acquire. (*Id.* at § 2.8(c))  Yucaipa argues that ComVest, as the Requisite Lender at the time of the assignment, "provided the required consent" to change the Assignment Agreement to allow Yucaipa to be an "Eligible Assignee" for purposes of the LC Commitments and excess Term Loans. (*Id.*)  Therefore, Yucaipa argues that its acquisition of the LC Commitments and excess Term Loans was valid under the plain text of the Third Amendment. (*See id.*)

BD/S argues that Yucaipa's clear attempt at an end run around the restrictions set forth in the FLCA and the Third Amendment should be rejected. The court agrees that the Requisite Lenders' authority to approve changes to the form Assignment Agreement that would substantively change the terms of the FLCA is plainly subject to the amendment provision of the FLCA requiring the consent of all "affected" Lenders. (*See* FLCA at § 10.5(b))  Accordingly, the court rejects Yucaipa's argument that it properly acquired LC Commitments and excess Term Loans by virtue of ComVest's consent to amend the form Assignment Agreement, and that those amounts could be included for purposes of the Requisite Lender determination.

32

Finally, Yucaipa argues that the bankruptcy court erred in excluding Yucaipa's

obligations from the denominator of the Requisite Lender equation based on § 2.1(e) of the

Third Amendment, which provides: "[W]ith respect to any provisions of [the FLCA] **relating**

**to the voting rights** of Lenders ... the aggregate outstanding principal amount of the Term

Loan of All Restricted Sponsor Affiliates shall be disregarded for purposes of 'Term Loan

Exposure.'" (*See* Third Amendment § 2.1(e), emphasis added)  Yucaipa argues again that

the FLCA's definition of Requisite Lender does not refer to or relate to voting rights. (*See*

Yucaipa at 27)  Rather, Yucaipa argues, the definition merely states that the Requisite

Lenders are **one or more Lenders** having or holding more than 50% of the aggregate first

lien debt exposure of all Lenders, and the Third Amendment explicitly allowed Yucaipa to

become a **Lender**. (*See id.* at 27-28)  Accordingly, Yucaipa argues that the bankruptcy

court erred in excluding Yucaipa's debt holdings from the denominator of the Requisite

Lender calculation based on a provision that was limited to "voting rights." (*See id.*)  As

noted above, the court rejects the argument that the Requisite Lender determination is not a

provision "relating to the voting rights of Lenders," and the court finds no error in the

bankruptcy court's reliance on this provision of the Third Amendment in making the

Requisite Lender determination.

**E. Whether the Bankruptcy Court Erred in Granting Summary Judgment Based on its Conclusion that New York Law Dictating that an Assignment Made in Contravention of a Contractual Provision Is Valid Unless the Contract Also Contains Clear, Definite and Appropriate Language Declaring Such Assignment Void or Invalid Was Inapplicable to this Case?**

Notwithstanding the Third Amendment's provision that Yucaipa cannot be an Eligible

Assignee with respect to LC Commitments, Yucaipa argues that ComVest's assignment of

the LC Commitments was nevertheless valid under controlling New York law and, thus, the

debt must be included in the Requisite Lender calculation. (*See* Yucaipa at 32-33)  Yucaipa

argues that New York courts have consistently held that "'[t]o reveal the intent necessary to

preclude the power to assign, or cause an assignment violative of contractual provisions to be wholly void, [a contractual] clause must contain express provisions that any assignment shall be void or invalid if not made in a certain specified way.'" (See id. at 23-24, citing In re 785 Partners LLC, No. 11-13702, 2012 WL 401497, at *3 (Bankr. S.D.N.Y. Feb. 7, 2012), quoting Pravin Banker Assocs., Ltd. v. Banco Popular Del Peru, 109 F.3d 850, 856 (2d Cir. 1997) (internal quotation marks and citation omitted))  Yucaipa argues that the FLCA's assignment provision does not prohibit assignments to assignees that are not Eligible Assignees or expressly state that such assignments are void. (See FLCA § 10.6(c)) Yucaipa concludes that ComVest's assignment in contravention of the FLCA's terms gave rise to "no more than a claim for breach of contract against the assignor/obligee, but does not invalidate the assignment." (See Yucaipa at 24, 33, citing In re 785 Partners, 2012 WL 401497, at *3)  On this basis, Yucaipa argues that it validly acquired the LC Commitments and the bankruptcy court should have included that debt in the Requisite Lender calculation as a matter of law.

BD/S argues that the Third Amendment left untouched the FLCA's prohibition on purchases of LC Commitments by Yucaipa.  The Third Amendment's definition of Eligible Assignee provides that "no Restricted Sponsor Affiliate [Yucaipa] may be an Eligible Assignee with respect to a sale, assignment or transfer of Commitments, Revolving Loans, or LC Deposits." (See FLCA at § 2.1(c))  Based on this exclusionary language, BD/S contends that Yucaipa was expressly prohibited from purchasing LC Commitments under both the FLCA and the Third Amendment.  BD/S further argues that the cases cited by Yucaipa are easily distinguished because they involved different facts and because the assignment provisions at issue in those cases contained inclusionary, rather than exclusionary, language. (See BD/S at 29-31)

34

In granting the motion for summary judgment, the bankruptcy court considered the cases cited by Yucaipa and stated that "I've looked at those cases [*785 Partners* and *Pravin*], and this case is a very different case I believe from those ..." (*See* 7/30/13 Hr'g. Tr. at 129:4-5) In *Pravin*, the assignment provision at issue stated: "We [Mellon] may assign all or any part of our interest in this letter agreement to any financial institution." *Pravin*, 109 F.3d at 856. The court rejected the argument that the assignee, Pravin, was prohibited from buying Mellon's debt and was not a proper assignee because it was not a financial institution. *See id.* The court found that the agreement's assignment language "fails to restrict the assignment expressly in any way. While it explicitly permits assignments to financial institutions, it does not limit assignments only to these entities. The assignment was therefore valid ...." *Id.* at 856. Yucaipa argues that *Pravin* has direct application to this case because while the FLCA assignment provision explicitly permits assignments to Eligible Assignees, it does not limit assignments only to those entities, nor does it contain language stating that an assignment to an assignee that is not an Eligible Assignee is void or invalid. (*See* Yucaipa at 25)

The court disagrees. Unlike *Pravin*, the FLCA and Third Amendment do not just permit assignments to Eligible Assignees. Importantly, those documents also "restrict assignment expressly" as contemplated by the Second Circuit in *Pravin*. The FLCA expressly prohibits Yucaipa by name from being an Eligible Assignee. (*See* FLCA at § 1.1 ("no ... Sponsor shall be an Eligible Assignee")) The Third Amendment expressly prohibits Yucaipa by name from being assigned any LC Commitments, any Revolving Loans, and Term Loans over a certain limit. (*See* Third Amendment at § 2.1 ("no Restricted Sponsor Affiliate [Yucaipa] may be an Eligible Assignee with respect to a sale, assignment or transfer of Commitments, Revolving Loans, or LC Deposits.")) Where language prohibiting an assignment is expressed clearly and unambiguously, as here, "there [is] no need for the

35

non-assignment clause to also contain talismanic language or magic words describing the effect of any attempt by the [assignor] to make an assignment." *Singer Asset Fin. Co. v. Bachus*, 741 N.Y.S. 2d 618, 620 (N.Y. App. Div. 2002).

Yucaipa's reliance on *785 Partners* is misplaced as well. In that case, the loan agreement at issue provided that the original lender was permitted to assign rights to any "Eligible Lender." *See 785 Partners*, 2012 WL 401497, at *1. The debtor argued that First Manhattan was not an "Eligible Lender" under the loan agreement and that the assignment, along with the claim associated with the impermissibly assigned debt, were both invalid. *See id.* at *2. The court found that the assignment was nevertheless valid under New York law. "Absent clear voiding language, such an assignment gives the obligor no more than a claim for breach of contract against the assignor/obligee, but does not invalidate the assignment." *See id.* at *3. Yucaipa argues that BD/S have made the same argument here – that Yucaipa was not an "Eligible Assignee" – and that the assignment here, as in *785 Partners*, is nevertheless valid in absence of language providing that the assignment is void. However, the exclusionary language present in the FLCA – which expressly excluded a specific assignee, Yucaipa, by name, from the definition of "Eligible Assignee" – was not present in *785 Partners*.

In light of the clear and unambiguous language prohibiting and limiting Yucaipa's ability to be assigned First Lien Debt, none of the cases cited by Yucaipa support a finding that its assignment of the LC Commitments and excess Term Loans in contravention of the FLCA was valid. The court finds that language contained in the FLCA and the Third Amendment "restrict[ing] the assignment expressly" satisfies the *Pravin* standard, and the bankruptcy court did not err in in holding that *Pravin* and *785 Partners* were "not applicable or inapposite." *See Pravin,* 109 F.3d at 856.

36

## F. Whether the Bankruptcy Court Erred in Granting Summary Judgment Based on its Conclusion that Debt Owned by AMMC Can Be Included in BD/S's Holdings for the Purpose of Calculating the Requisite Lender?

Yucaipa argues that even if all of Yucaipa's debt is excluded from the Requisite Lender calculation, and $109,211,840 is the proper denominator, BD/S still does not hold more than 50% of the First Lien Debt and cannot be Requisite Lender. Although Yucaipa concedes that BD/S holds $51,938,610 in First Lien Debt, Yucaipa disputes that the $4,548,354 of debt assigned to BD/S by AMMC may be counted for purposes of the Requisite Lender calculation. Yucaipa argues that the AMMC debt should not be ascribed to BD/S because the AMMC Trade assignment was not properly recorded by the Administrative Agent as required by the FLCA. (See Yucaipa at 34) However, in reaching its determination that BD/S were the Requisite Lenders under the Third Amendment, the bankruptcy court overruled Yucaipa's argument that the AMMC debt must be excluded from the numerator of the Requisite Lender calculation. (See 7/30/13 Hr'g. Tr. at 128)

The FLCA provides that "Assignments and assumptions of Loans, LC Deposits and Commitments shall only be effected by manual execution and delivery to the Administrative Agent of an Assignment Agreement ...." (See FLCA at § 10.6(d)) The FLCA further provides that "no assignment ... shall be effective, in each case, unless and until recorded in the Register following receipt of an Assignment Agreement effecting the assignment or transfer thereof, in each case, as provided in section 10.6(d)." (See id. § 10.7(b))

CIT previously served as Administrative Agent under the FLCA but resigned on May 19, 2012, before the AMMC Trade. Although the FLCA provided that, upon resignation of the Administrative Agent, the Requisite Lenders have the right to appoint a successor Administrative Agent, no successor was appointed at that time. On June 5, 2012, AMMC assigned $4,548,354 of its First Lien Debt to BD/S pursuant to the AMMC Trade

37

Confirmations. Because no successor administrative agent had been appointed, the trade was not recorded in Allied's books at the time of the AMMC Trade.

BD/S argues that thereafter, at the hearing held on November 19, 2012, the New York Court ruled that the Fourth Amendment was void *ab initio* and that, as a result, Yucaipa was not Requisite Lender. As of that date, the First Lien Debt Yucaipa attempted to acquire pursuant to the Fourth Amendment did not count in the Requisite Lender calculation. On December 3, 2012, shortly after the New York Court's ruling, BD/S and AMMC together held $56,486,964 in First Lien Debt, which represented more than 50% of the approximately $109 million in the denominator of the Requisite Lender calculation once Yucaipa's debt was excluded. Although the AMMC Trade had not yet been recorded, the AMMC Trade Confirmations gave BD/S control over AMMC's First Lien Debt, including the power to direct AMMC to vote its First Lien Debt and/or exercise rights and remedies under the FLCA as BD/S saw fit. (*See* Committee Action D.I. No. 268, Ex. 9) As Requisite Lenders, BD/S and AMMC appointed the Successor Agents on or about December 3, 2012, who thereafter registered the AMMC Trade. (*See* Committee Action D.I. 268 ¶¶ 14, 16)

Yucaipa contends that BD/S did not have authority to appoint the Successor Agents in December 2012 and the assignment of the AMMC Trade was never validly recorded and cannot be counted for purposes of the Requisite Lender calculation. In this regard, Yucaipa argues that although the New York Court may have ruled on the issue at the hearing on November 19, 2012, its written ruling did not issue until March 8, 2013, three months after BD/S appointed the Successor Agents, and the New York Court's decision was not final until that time. (*See* Yucaipa R. at 15) On this basis, Yucaipa argues that the appointment of the Successor Agents in December 2012 was not valid, and the Successor Agents' attempt to register the AMMC Trade was also invalid. (*See id.*)

Yucaipa also contends that even if the New York Court's ruling was effective on November 19, 2012, the New York Court only found that "the Fourth Amendment is not and never was effective" and that "Yucaipa is not the Requisite Lender[.]" (*See* Yucaipa at 34) Yucaipa argues that the New York Court "did not perform a Requisite Lender calculation and did not determine that BD/S (or anyone else) was the Requisite Lender." (*See id.* at 34-35) As such, Yucaipa argues that BD/S did not become Requisite Lenders by mere virtue of the New York Court's ruling, and did not have authority to name the Successor Agents in December 2012. According to Yucaipa, the AMMC Trade was not properly recorded and should not have been included for purposes of the Requisite Lender calculation. (*See id.*)

The bankruptcy court rejected these arguments and held that, "[a]s a result of Justice Ramos' decision, [BD/S] became requisite lender." (*See* 7/30/13 Hr'g. Tr. at 128:7-8) The bankruptcy court found that the fact that BD/S have been the Requisite Lenders since the New York Court's ruling "hasn't been determined by a court of law until today, but the facts that existed, that made them the requisite lender that is being identified today existed after [the New York Court's] decision." (*See id.* at 128:8-12) "And after that point, [BD/S] acted to appoint an agent, and they did the recommendation that they were supposed to do in appointing that agent. So … I disagree with and overrule the argument that the [AMMC] debt cannot be included in [BD/S's] number." (*Id.* at 128:12-17)

The court agrees that BD/S have been the Requisite Lenders since the New York Court's ruling on November 19, 2013, and BD/S had authority to appoint the Successor Agents under the FCLA in December 2012. The court is not persuaded by Yucaipa's argument that because the New York Court did not perform its own Requisite Lender determination at that time, BD/S was without power to appoint the Successor Agents. There is no provision in the FLCA that requires a judicial determination of the identity of

Requisite Lenders. The Requisite Lender calculation applies to identify the Requisite

Lenders at any given time based on the ownership of the First Lien Debt. The bankruptcy

court did not err in concluding that the Successor Agents were properly appointed by BD/S

and that the AMMC was properly recorded.

### G. Whether the Bankruptcy Court Erred in Overruling Yucaipa's Objections to BD/S's Admission and Reliance Upon Evidence that Was Admitted in the First Instance at the Reply Stage of BD/S's Motion for Summary Judgment?

In its motion for summary judgment, BD/S asserted $56,486,964 in combined Term

Loan Exposure and LC Commitments, which included the $4,548,354 AMMC Trade. BD/S

argued that its holdings represented greater than 50% of the aggregate Term Loan

Exposure, LC Commitments, and Revolving Exposure of all Lenders of $109,211,840. (*See*

MSJ at 29)

In its opposition to the motion for summary judgment, Yucaipa did not argue that

BD/S did not validly acquire the AMMC debt. Rather, Yucaipa argued that the AMMC Trade

was not effective because no Administrative Agent had recorded the transfer; $4,548,354 of

BD/S's asserted First Lien Debt could not be counted for purposes of the Requisite Lender

calculation. (*See* MSJ Opp. at 22) BD/S filed a reply in further support of the motion for

summary judgment, along with an affirmation ("Ward Affirmation") attaching copies of the

AMMC Trade Confirmations and joinders evidencing the agreement to purchase the AMMC

debt. (*See* Committee Action D.I. 268, ¶¶ 10-14, Exs. 9-11) The Ward Affirmation states

that "[t]he AMMC Trade Confirmations conclusively establish that as of June 5, 2012, [BD/S]

controlled the AMMC VIII Obligations which included the power to direct AMMC to vote

those Obligations and/or exercise rights and remedies under the [FLCA] as [BD/S] saw fit.

Prior to Justice Ramos' ruing in November 2012 invalidating the Fourth Amendment and

declaring that Yucaipa is not the Requisite Lender, [BD/S] indisputably controlled over $4

million of AMMC First Lien Obligations." (*See id.* at ¶ 12)

Yucaipa argues on appeal that "the bankruptcy court should not have considered the AMMC assignment at all because BD/S submitted evidence to support their assertion that that they acquired AMMC's debt for the first time on reply below." (*See* Yucaipa at 35 n.18). Conversely, BD/S argues that courts can consider evidence submitted on reply to "rebut new facts raised in the opposition brief." In Yucaipa's opposition to the motion for summary judgment, Yucaipa raised the issue of the effectiveness of the AMMC Trade, requiring BD/S to rebut Yucaipa's assertion with evidence of the AMMC Trade. (*See* BD/S at 35)

In support of its argument, Yucaipa cites this court's local rule governing the form and contents of briefs, which provides in relevant part that "[t]he party filing the opening brief shall not reserve material for the reply brief which should have been included in a full and fair opening brief." (*See* Yucaipa at 35 n. 18, citing D. Del. L.R. 7.1.3(c)(2)) Yucaipa further argues that "[e]vidence raised for the first time in reply must rebut new facts raised in opposition brief, not bolster arguments made in the initial motion." (*See id.,* citing *Lab. Skin Care, Inc., v. Ltd. Brands, Inc.*, 757 F. Supp. 2d 431, 439 (D. Del. 2010)) Yucaipa asserts that in *Laboratory Skin Care*, this court specifically struck new evidence that was submitted by the moving party in support of summary judgment and denied summary judgment. *See Lab. Skin Care*, 757 F. Supp. at 439. However, in that case, the court struck evidence submitted by defendants on reply because that evidence was not submitted to respond to plaintiff's opposition brief. *See id.* "[P]laintiffs, in their [opposition] brief, merely asserted that Defendants failed to establish necessary elements of their defense. Plaintiffs raised no new facts which Defendants must rebut." *Id.* The court concluded that the evidence and supporting declaration submitted on reply served to bolster defendants' original argument, not respond to that of plaintiffs, and defendants' reservation of that material for its reply brief violated D. Del. LR 7.1.3(c)(2). *See id.*

41

Unlike the evidence at issue in *Laboratory Skin Care*, BD/S's submission of the AMMC Trade Confirmations on reply was appropriate here to respond to the arguments and facts asserted by Yucaipa in its opposition. BD/S argued in the motion for summary judgment that it held $56,486,964 in combined First Lien Debt, including the $4,548,354 of debt it acquired in the AMMC Trade. (*See* MSJ at 29 n. 23). BD/S did not reserve that argument, or evidence in support thereof, for its reply; rather, its assertion was supported with two affidavits submitted contemporaneously with its motion for summary judgment. (*See* Committee Action D.I. 256 (Affidavit of Ricard Ehrlich) at ¶ 2; D.I. 257 (Affidavit of Jeffrey Schaffer) at ¶ 2) Yucaipa raised the issue of the effectiveness of the AMMC Trade in its opposition to the motion for summary judgment and argued that the AMMC debt could not be counted for purposes of the Requisite Lender calculation because it was not properly recorded by the Successor Agents. (*See* MSJ Opp. at 22). It was not inappropriate for BD/S, in support of its reply, to rebut Yucaipa's assertion with evidence of the AMMC Trade, including the Ward Affirmation and the AMMC Trade Confirmations, to demonstrate not only the effectiveness of the transfer but also BD/S's de facto control over the $4,548,354 of AMMC debt. This material was not reserved for the reply stage but rather was submitted in response to arguments contained in Yucaipa's opposition. The submission of this evidence on reply did not violate D. Del. 7.1.3(c)(2). *See e.g., In re Boston Scientific Scimed. Inc. v. Cordis Corp.*, 434 F.Supp.2d 308, 314 (D. Del. 2006) *rev'd in part on other grounds*, 554 F.3d 982 (Fed. Cir. 2009) (allowing material that was responsive to arguments in opposition brief); *In re Fleming Co.,* 316 B.R. 809, 815 n.3 (D. Del. 2004) (denying motion to strike portions of reply where its arguments were "either in the original brief or in response to arguments in opposition"). The bankruptcy court did not err in overruling Yucaipa's objection to BD/S's submission of the AMMC Trade Confirmations.

### H. Whether the Bankruptcy Court Erred in Granting the Motion for Summary Judgment Based on its Conclusion that BD/S Are the Requisite Lenders?

For the reasons set forth herein, the bankruptcy court did not err in concluding that the Third Amendment was validly enacted with Requisite Lender consent and, therefore, governs the determination of the Requisite Lenders under the FLCA. The court further finds no error in the bankruptcy court's conclusion that the Third Amendment is unambiguous and that Yucaipa's debt must be excluded from the Requisite Lender determination pursuant to § 2.1(e). As BD/S holds "more than 50% of the sum of (i) the aggregate Term Loan Exposure of all Lenders, (ii) the aggregate LC Exposure of all Lenders and (iii) the aggregate Revolving Exposure of all Lenders" the bankruptcy court correctly concluded that BD/S are the Requisite Lenders pursuant to § 1.1 of the FLCA.

### VI. CONCLUSION

For the foregoing reasons, the bankruptcy court's August 7, 2013 order is affirmed, and Yucaipa's appeal is denied. An appropriate order shall issue.